LEDYARD *vs.* TEN EYCK.

An inland lake, five miles long and three-fourths of a mile wide, having no current and no main inlet, is not, in any legal or just sense of the term, navigable water. It is not a highway, and is too small to be of any practical use in navigation, except as a connecting link of some chain of internal · improvement.

Where the state issued a patent, embracing a portion of such a lake within its boundaries, the northern line crossing the lake, but there was no restriction, or exception of the lake, no reference made to it, and no reservation of the water, or the land under water; *it was held* that the grant carried the southern portion of the lake to the grantee, absolutely.

Where lands are bounded, in a deed of conveyance, by a lake of that description, and the outlet thereof, the title of the grantee extends *usque ad medium filum aquæ*. At all events, the deed will carry the right to land subsequently filled in, where the water is shallow, immediately in front of the grantee's premises.

Where the state has sold and conveyed land bounded by a *navigable* lake or river, it holds the title to the land under water in front of the premises as *trustee* for the *public*, in order to protect navigation and prevent hindrances or obstructions. At the same time, the state declares itself *trustee* for the *riparian proprietor*, and provides that grants shall be made to him alone, · and that they will be made not only for purposes of commerce, but, whenever proper, for the beneficial enjoyment of his adjacent lands.

When the proper and constituted authorities of the state proceed to deepen the outlet of a lake, and deposit the earth and stones that are removed, in the shallow water in front of and adjacent to premises previously conveyed to another by patent, it is a visible and public declaration that that portion of the lake can no longer be used for navigation; and the grantee will enter into possession, and the trusteeship of the state, both for the public and the riparian proprietor, is virtually at an end.

And such land being proper and necessary for the beneficial enjoyment of his adjacent premises, by the riparian proprietor, there arises if not a legal at least a strong equitable title, which being coupled with actual possession, no one, except the state itself, should be allowed to dispute.

No action will lie against such riparian proprietor, in favor of an adjoining owner, to restrain the planting of trees upon such newly acquired land, and thereby obstructing the plaintiff's view of the lake. BALCOM, J. dissented.

In New York the public have no highway along the margin of our navigable rivers and lakes, unless the same has been acquired by express grant or prescription. *Per* CAMPBELL, J.

CAZENOVIA LAKE is a natural body of water, situate in the town of Cazenovia, in the county of Madison,

Ledyard *v.* Ten Eyck.

about five miles long and three-fourths of a mile wide. On the 20th day of October, 1794, Edward Edwards received from the state of New York a patent purporting to convey to him 15,000 acres of land, described by certain metes and bounds. The north line of said boundary crosses Cazenovia lake a short distance north of the south end thereof, and includes within its boundaries all the premises in any way referred to in this case. The plaintiff owns a farm situate at the south end of said lake, and has upon it his dwelling house situate about 100 rods from the lake. The defendant owns the land lying upon the east shore of the lake, bounded by the lake and outlet thereof, upon which is situate his dwelling house, very near to the shore of said lake, in which dwelling the defendant and his father have resided for the last 37 years. In the years 1856 and 1857, the people of the state of New York, by their agents, the canal commissioners and engineers, lowered the outlet of said lake for the purpose of using the Cazenovia lake as a reservoir and feeder for the Erie canal, and in doing said work they excavated out into said lake and deposited the earth excavated in shallow water of the lake adjoining the defendant's said premises, thereby making about one-fourth of an acre of dry land, extending into said lake from the defendant's shore about 160 feet. The work was done by the defendant under contract with the state, and was necessary for state purposes. The defendant immediately took possession of said land and laid out large sums of money in grading and beautifying it; and the plaintiff was often upon the work and found no fault with it, but commended it as being a fine improvement. After the work was completed and improvements made, and the defendant had set out trees on the new land, the plaintiff objected to the trees growing, claiming that they intercepted his view of the lake. As great a part of the plaintiff's view of the lake is already cut off by trees growing on his own premises, as will be by the trees set out by the defendant. The plaintiff brought this suit, claiming title to the bed of the lake, and

Ledyard *v.* Ten Eyck.

that the trees so set out by the defendant will at some future day be an injury to the plaintiff by cutting off his view from a portion of the lake. The action was referred to a referee, who found and reported the following conclusions of law: 1st. That the defendant had no right to set out or grow trees on the land made in said lake by deposits of earth, and had no right to keep the trees on said land set out by him, and that he had no right to set out or grow other trees on said land. 2d. That the plaintiff had not and never had title to any portion of the land under the water of said Cazenovia lake. 3d. That the defendant had not and never had title to any portion of the land under the water of Cazenovia lake. 4th. That the people of the state had title to the bed of said lake, and said lake is and always has been public property. 5th. That the people of the state own said land made in said lake by deposits of earth, and have the same title thereto, and no other; that they have to the bed of said lake; and said land is public property. 6th. That said lake and the land made therein by deposits of earth as aforesaid are a public highway. 7th. That the special damage sustained by the plaintiff, by reason of the setting out of said trees by the defendant on the land, and the special damage the plaintiff would sustain if the defendant should keep said trees on the land, or grow them or other trees on said land made in the lake as aforesaid, entitled the plaintiff to maintain this action, and to a judgment that the defendant remove from said land the trees so set out by him, and refrain from planting or growing any trees upon said land. 8th. That the plaintiff was entitled to an injunction, commanding and requiring the defendant to remove the trees from said land set out by him as aforesaid, and restraining the defendant from planting or growing trees on said land. 9th. That neither party was entitled to costs against the other, but each party must pay his own costs in the action and half the fees of the referee. To each and every part of which conclusions the defendant excepted.

From the judgment entered upon this report, the defendant appealed to the general term.

*D. W. Cameron,* for the appellant. I. The plaintiff never had any title to the premises in question, nor to the land underlying any part of the Cazenovia lake. (1.) The patent, as well as all the deeds under which the plaintiff claims, never conveyed the lands underlying the lake. The plaintiff claims in his complaint, and the referee finds, that "Cazenovia lake" is a navigable body of water, three-fourths of a mile wide and five miles long. The ownership of navigable lakes is in the public. Chancellor Walworth, in 5 *Wendell,* 423, speaking of the fresh water lakes in this state, says that the shores, down to low water mark, belong to riparian owners, and *the beds of the lakes, with the islands therein, to the public.* See also the conclusions arrived at by the chancellor in note on page 424, and his opinion on page 447; also conclusions arrived at by him in 17 *Wendell,* 571, 2. If there was any power short of the legislature to dispose of the land underlying our large navigable lakes, it is quite clear that the same power would dispose of the land underlying large navigable rivers and lakes for the promotion of the commerce of the state. But this power has always been vested in the commissioners of the land office, whenever and wherever it has been exercised by any department of the state government. By the revised statutes, the power is given to the commissioners of the land office *to grant to the adjacent* owners so much of the land under the navigable rivers and lakes as shall be necessary to promote the commerce of the state, and declares grants made to any others than adjacent owners void. (1 *R. S. 5th ed.* 552.) The wisdom of the legislature in restricting these grants to the owners of the adjoining land cannot be questioned, and it will not be presumed that a right thus carefully guarded and protected by the legislature from the first time we ever had any legislation concerning it, was before disposed of without any authority from the peo-

ple, or in other words, the public, speaking through their only representative, the legislature. See also each edition of the revised statutes; also 1 *R. L.*, 1813, *p.* 293, § 4; *Kent. & Radcliff's ed.*, 1801, *p.* 299, § 11. It is true that this provision did not include *lakes* until 1815, when, by an amendment, the provision was made to extend to *lakes.* (*Laws of* 1815, *chap.* 199, § 1.) The reason for this is undoubtedly the fact, that up to this time no circumstances had required a provision of this kind. Commerce had called for grants and improvements along many if not all our large rivers, many years before the shores of any of our inland lakes had needed improvements to satisfy her demands. It cannot be shown that any department of the government assumed the right to dispose of the land underlying lakes, *even with these restrictions*, until after the act of 1815. See special acts granting islands above tide water in navigable rivers, cited in 13 *Wendell*, 359, 60.

II. If there was any force in the plaintiff's position that the patent gave a legal title to the land under the lake, public policy and equity would compel him to relinquish such claim so far as he conveyed the adjoining lands and bounded them by the lake. The legislature, by restricting the commissioners of the land office to sell only to adjoining owners, shows clearly its intention that no other than such adjoining owner should ever become owner of the land under the water. If Mr. Lincklaen, at the time he deeded the Ten Eyck premises, was the owner of the adjoining land covered by water, it passed with the land conveyed, as an appurtenance, as a right and privilege without which the premises conveyed would be comparatively worthless. The legislature took this view of the question when they enacted that it should only be conveyed as such appurtenance. (1 *R. S. 5th ed.* 559.) The doctrine that a conveyance of land bounded by a stream or large navigable river extends to the middle of the stream, would hardly be denied, except when the words used show an intent to limit the grant to the shore. (3 *Kent's Com.* 7th

*ed.* 514 *to* 520, *and notes.* 17 *Wend.* 404. 20 *id.* 149. 5 *id.* 423. 4 *Hill,* 369. 2 *Hil. R. Es.* 97, 357. 2 *Smith's Lead. Cas.* 216 *to* 227.) No case cited by the plaintiff *holds directly* that this principle does not apply to fresh water lakes. Nearly every case arose in regard to a mill privilege, and the "pond" was held to be a monument. In one of the cases the court holds that where the pond was created by a dam, the conveyance goes to the center. But in no case is the distinct question raised and decided by the court that a conveyance bounded by a fresh water lake does not convey *all the rights which the grantor has to the center.* There can be no force in the plaintiff's position that there must be a thread or gutter to which the conveyance runs. It will hardly be contended that the waters of our large navigable rivers are to be either *sounded* or dried up, in order to find just where the thread of the stream is. Wherever the question has arisen in regard to *islands* in rivers, it was the *center,* not the thread or lowest point, which governed. The same rule may be applied to lakes, and undoubtedly will be, *if the grantor have any interest underlying the lake to convey.* We think the more sensible rule to be, that he has no such interest; that it remains in the public; but if he has, it passes with the adjoining lands as an appurtenance.

III. If the plaintiff ever had title to the premises, it was extinguished by being appropriated by the state, whereby the legal title or fee vested in the state. (1.) The *resolution* passed by the canal board before the commencement of the work is an appropriation of the whole lake, not of the waters thereof, nor of any specific part, but of the lake. By no fair or reasonable construction can this resolution be held to appropriate only the water. The general rule is, that the map is to be referred to as showing what the resolution was intended to cover. (15 *Barb.* 627.) But in this case the resolution speaks in more plain and unmistakable language than a map can be made to speak. The map introduced by the plaintiff is only the original plan by which the outlet was to

Ledyard *v.* Ten Eyck.

be constructed so as to make the lake available for the purposes intended. The resolution offered by the plaintiff, showing an appropriation of the waters of the lake, rather confirms than negatives the idea that the first resolution takes the land underlying it; then, as if doubting whether the *water* had been appropriated, they pass this second resolution. The word lake should have a definition at least as broad as that judicially given to " *pool*," *which includes land and water*. (2 *Hil. R. Prop.* 356.) There can be no difference in the meaning of the terms, except that " lake" embraces or is applied to larger bodies of water. It would hardly be claimed by the plaintiff that the deeds which he introduced in evidence, and which purport to convey all ponds, pools, &c., only referred to the waters thereof. But these terms are not used in the original patent. They have been inserted in some of the more recent grants, doubtless for the purpose of sustaining an action similar to this. If the construction put upon the word " water" in 5 *Cowen*, 216, and *Co. Litt.* 4, 6, to which the plaintiff refers, is to prevail, then an appropriation by the state of the water of a run, or the water of this lake, would only give the state *the right to fish therein*. The word land includes every thing under and over it, but by a grant of water, only covers a right to fish therein. (2 *Black. Com.* 19.) See this authority for the distinction that prevailed between the word " water" and other terms used in grants. (2.) No formal resolution is necessary; but an entry upon and laying out of the work is sufficient. (15 *Wend.* 569. 2 *Hill*, 342. 19 *Barb.* 263. 6 *Hill*, 359. 1 *R. S.* 5th ed. 581, §§ 17, 18, 19.) See last authority for power of canal commissioners to construct works of this kind. The appropriation of the land, by the authorized agents of the state, confers the right to enter and use the soil, although the fee does not vest until the appraisal of damages. (2 *Hill*, 342.) But the title of the state in this case is as complete as if damages had been appraised and paid. Claim for damages must be made within one year after the premises are

taken, or the individual entitled to damages " shall de deemed to have surrendered to the state his interest in the premises so appropriated. (1 *R. S. 5th ed.* 594, § 84. 9 *Barb.* 496. 15 *id.* 627.) That this provision of the statute is not in violation of the constitution, is clearly held in 1 *Kernan,* 308. It was admitted upon the trial that no claim for damages was made by the plaintiff in this case. That the agents of the state, having full authority, entered upon the land in question and appropriated it to and for the use of the state, cannot be questioned. The evidence shows that the agents of the state took possession of the land and directed the work. The evidence of Mr. Fitzhugh does not in any way change or contradict the facts sworn to by the engineers. The work was not only done under direction of engineers, but the commissioners left the matter to their discretion, and never made objection to it. The fee simple of the lands vests in the state. (1 *R. S. 5th ed.* 596, § 95.) (3.) The laying out of the work was properly done by the engineers. It is the duty of the resident engineer, under the immediate direction of the division engineers, to lay out the work, &c. (*Id.* 610, § 180.)

IV. The plaintiff is estopped from claiming title to the property in question, or in any way objecting to the defendant's full enjoyment thereof, by reason of his own acts of acquiescence. The evidence shows that the plaintiff was present while said work was being done, and made no objection whatever—both while the state work was being done, and while the defendant was grading and beautifying the grounds upon his own account. Richmond testifies : " The plaintiff *was often on the work during its progress,* and we often *changed the line at his request, to gratify him.*" Van Brocklyn swears : " The plaintiff was frequently on the work during its progress. I don't recollect of his ever finding any fault, or making any objection to this filling up ; he never made any objection or protest against it." The defendant testifies : " The plaintiff was frequently on the premises while the work was in progress, and never attempted to stop or forbid it.

He said he thought it was a very handsome improvement, and spoke of it as beautifying the whole town as well as my own premises." Again he swears : " The plaintiff never pretended to me that he had a title, and I never knew that he had or claimed title to it ; he never spoke about it or objected to it until after the trees were set out." If the plaintiff had denied any part of this testimony, he was a competent witness and had already been sworn, but he does not refer to it ; and we are to take the evidence as a plain and true statement of the facts. " If a party maintains silence when conscience requires him to speak, equity will debar him from speaking when conscience requires him to be silent." (*Hall* v. *Fisher,* 9 *Barb.* 17, 31. 1 *Story's Eq.* §§ 388, 9. 1 *John. Ch.* 344, 353. *Storrs* v. *Barker,* 6 *id.* 166, 170. *Niven* v. *Belknap,* 2 *John.* 573, 589. 2 *Lead. Cas.* 64, 65. *Higinbotham* v. *Burnet,* 5 *John. Ch.* 184. 6 *Seld.* (10 *N. Y.*) 412. 27 *Barb.* 595.) A man is concluded from saying any thing, even the truth, against his own act or admission. If a man knowingly, though passively, by looking on, *should suffer* another to purchase or expend money on or about a mill site, *under an erroneous impression of his title, without making known his claim,* he cannot afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience would be bound by such equitable estoppel. (*Ang. on Water Courses,* 403. 1 *John. Ch. R.* 344, 353.) The supreme court of Massachusetts lays down the principle in the following unmistakable language : " When one stands by and sees another laying out money and making large investments upon property to which he himself has some claim or title, and *does not give notice of it,* he cannot afterwards, in equity and good conscience, set up such claim or title." (*Gray* v. *Bartlett,* 20 *Pick.* 193.) Ignorance of the law will not prevent the application of the rule of equitable estoppel, when the circumstances would otherwise create an equitable bar to the legal title. (6 *John. Ch. R.* 166. 27 *Barb.* 595.) The only case cited by the

plaintiff before the referee, holds simply that where a person , gives a receipt to a corporation as such, it is no estoppel, and either party may disprove it. (8 *Wend.* 480.) This principle has always been termed elementary, that a receipt may either be explained or contradicted.

V. The referee erred in holding that the dry land made by the state, adjoining the defendant's premises, is a public highway. (1.) The distinction between a "public highway by land" and a "public highway by water," is precisely the same as between "land" and "water." The definition of either is simply an "easement or right of way," while one is a right of way over land, and the other is a right of way over water. In regard to navigable lakes and rivers, the soil is private property, belonging either to the owner of the adjoining shore or to the state. Sir Matthew Hale, in his excellent *Treatise,* discusses the rights which the public have upon navigable waters, and says "*they are public highways by water.*" (*Harg. Tracts, De Jure Maris, &c. Angell on Water Courses,* § 535.) If this be the correct rule, it will hardly be claimed that after the water is diverted to some other bed, or shut off by government, the dry land is still a highway by water, or in other words, a highway over which the public can float vessels, boats or rafts. If a river changes its course and runs over a cultivated field, the new channel is *the* public highway *by water.* (*Angell on Water Courses,* § 540.) It will not be pretended that there will thus be created two public highways running parellel—one by land and the other by water. (2.) The action of the legislature is totally at war with this idea that the dry land thus created is a highway. The legislature has authorized the commissioners of the land office to convey to the adjacent owners the land under navigable waters; and for what purpose? To convert into a more valuable highway, either by land or water? Most certainly not. The language of the statute is: " The commissioners of the land office shall have power to grant in perpetuity, or otherwise, so much of the lands under

the waters of navigable rivers or lakes as they shall deem necessary. to promote the commerce of this state, or proper for the purpose of beneficial enjoyment of the same by the adjacent owner." (1 *R. S. 5th ed. 552.*) It is quite certain that a grant made to an adjoining owner, under this statute, would give the grantee the right to convert it into dry land, and treat it as it would be, in fact, his own private property. If it is private property in the hands of the grantee of the state, and not a public highway, what can render it other than private property in the hands of the state ? The grantee can have no greater rights under his grant than the grantor had to convey; and what the grantee could do, the grantor can do with precisely the same effect.

VI. The referee erred in finding that the state own the dry land made in said lake adjoining the defendant's premises, and that the defendant had no more right in it than to a public highway. (1.) The defendant is in full possession of the premises, and owns the fee in the adjoining land. This gives to the defendant additional rights in the adjoining waters or shore thereof, not common to all the citizens of the state. In *Angell on Tide Waters*, at p. 171, the principle is laid down as follows : "Riparian proprietors, it appears to be well settled, cannot be cut off from the water against their consent by any extraneous additions to their upland." In *Ball* v. *Slack*, (2 *Wharton*, 541,) Hutson, J. says : "The case of *Blandell* v. *Catterall* decides that although the king or the public may sail over land covered by the tide when up, yet the owner of the adjacent fast land can support trespass against one exercising acts of ownership at low water. And it must be so. If wharves can be erected between a man and the river, why not houses ? And if he has no remedy, a stranger may come between him and the river, and make his farm what is called a dry land farm." In *Bowman's Devisees* v. *Walthen*, (2 *McLean*, 381, 2,) Justice McLean says : "It is enough to know that the riparian right on the Ohio river extends to the water, and that no supervening right over any part of this

space can be exercised or maintained without the consent of the proprietor. He has the right of fishing, of ferry, and of every other right which is properly appurtenant to the soil, and he holds every one of these rights by as sacred a tenure as he holds the lands from which they emanate. The state cannot directly or indirectly divest him of any of these rights, except by the constitutional exercise of the power to appropriate private property to public uses." There is no pretense in this case that this dry land, or the defendant's right to a water front, has been appropriated by the state. It is the lake, and not the dry land they have made, which is being used for state purposes. The defendant, when he procured title to his land bounded by the lake, had with it certain rights which greatly increased its value. He has erected upon it a magnificent mansion, the yard and grounds of which border upon the lake. He has the exclusive right to fish upon the shores, to erect a landing place for his own private use, pleasure and profit. He has the right to the increase of the shore, by gradual accumulation or receding of the water. He has a right to the deposits made on and about the shore, either to enrich his lands or any other purpose; and not least among these rights is one to rear either ornamental or shade trees. If the decision of the referee be correct, then the state is bound to maintain this strip of made land as a public highway without a hearing, and the defendant is not to hold, occupy and enjoy his premises down to the lake, as he always has done, without the assent of the plaintiff and such other persons as may desire to question that right. (2.) The defendant has a title which has come down from the state, bounding him " on the west and south by the lake and the outlet thereof." The state is thus bound to give us a boundary by the lake, unless some great public necessity shall require the state to take from us that right. No such necessity exists. The state does not claim it. It is not necessary that it should hold or possess the land in question, either for purposes of navigation or for using the lake

as a reservoir, but it has left us in the full enjoyment of our rights. The only fair and reasonable conclusion is, that when the officers of the state thus built up dry land between the defendant's shore and the waters of the lake, our title still ran to the lake. This, at least, is a full answer to any demands which the plaintiff may set up against the defendant's possession. (3.) The defendant being in possession, and there being a legal mode by which he may have obtained the title, the plaintiff must give some evidence showing that the title is not in us. The presumption of law is, that we have title to all the land we occupy.

VII. The cases cited by the plaintiff to sustain the proposition that the plaintiff is entitled to recover if the state own the lake, do not affect the question before this court. The case in 6 *John. Ch. R.* 439 is where a party obstructed a street, which was a public thoroughfare. It was an obstruction which was a special damage, not in fancy but a pecuniary damage, and entitled the plaintiff to the protection of the courts. Several of the cases cited are where individuals owning tracts of land laid it out into lots, streets and parks, and then sold the lots with reference to a map representing the survey. The court held that the party could not afterwards inclose and build upon the streets thus laid out. The grantor had received an increased price by reason of the opening of those streets and parks ; and the purchasers, having paid for these appurtenances, were entitled to the full benefit accruing from them. This principle in no way charges the defendant with a wrong, but on the contrary, is good authority for claiming our title to the waters of the lake, a claim which the state in no way disputes.

VIII. The old common law doctrine in relation to ancient lights does not prevail in this country. (*Mahan* v. *Brown*, 13 *Wend.* 261. *Parker* v. *Foote*, 19 *id.* 309. 3 *Kent's Com.* 448. 10 *Barb.* 537.) In *Mahan* v. *Brown*, it was held that a man might open a window in his own house overlooking the privacy of his neighbor ; and unless the right to the

window light had been secured by grant, acquiescence, or otherwise, the only remedy for B. would be the erection on his own soil of an obstruction opposite the offensive window, and in that way shut out the light. In *Parker* v. *Foote,* our supreme court went so far as to declare that the modern English doctrine on the subject of lights and prospect was an anomaly in the law, and not applicable to the growing condition of this country. It further declares, that the injury resulting from window or other views are rather speculative, and not analogous to the case of ways, commons, markets, water courses, &c. where the injury is direct, palpable and material; and the same rule of presumption ought not to apply to two classes of cases so essentially different. Every case presented by the plaintiff and cited by the referee were cases where the injury was direct and material, and related to a street, way or water course, not for a prospect or loss of view, but for an obstruction to passage or use. They had no relation whatever to a look-out or view, and are consequently inapplicable to the present case. No action can be sustained for obstructing a look-out or view. (2 *Hil. Real Prop.* 79, § 19.) Even the English law, with all its "anomaly," does not recognize a servitude of mere prospect, except by express grant or covenant. (*Aldred's case,* 9 *Co.* 58. *Tindal, Ch. J.* in *Penwarden* v. *Chiny, Mood. & Mal.* 400. 13 *Wend.* 261. 19 *id.* 309. 3 *Kent's Com.* 7th ed. 549, *n. b, marg. p.* 448.)

IX. The decree directed by the referee is not asked for in the complaint, and the relief granted is based upon a theory in no way set out or referred to in the plaintiff's complaint. The only basis for the relief demanded, as alleged in the complaint, is title in the plaintiff to the bed of the lake; while the only relief demanded is the removal of the earth and stones so as to convert the dry land into lake. The plaintiff entirely failed to prove the facts alleged in his complaint as the basis of his action.

X. The referee erred in allowing the witness Smith to testify in relation to damages. The question of damage was

for the referee. It cannot be said that the evidence had no bearing, from the fact that no damages were awarded. The question of damage was an important one with the referee in coming to a conclusion upon the right of the plaintiff to an injunction, and upon this question the defendant has a right to the opinion of the referee untrammeled by the views of other persons. The position that the piece of made land is a public highway, notwithstanding the fact that the defendant has always had exclusive possession of it since it was made dry land, cannot be maintained, either by authority or upon principle; and with possession, the defendant has the presumption of ownership. But in no possible event can the ancient rule of lights or prospect, even though it were not obsolete in this country, be made applicable to the growing of shade or ornamental trees in the defendant's inclosure, an hundred rods from the plaintiff's stand-point or look-out.

*D. Pratt* and *C. Stebbins, Jr.*, for the plaintiff. I. The defendant showed no title upon the trial to the *locus in quo*. (1.) The conveyance under which he claims, bounds his lands on the west by the margin of the lake. (2.) The rule that a conveyance of land, bounded upon a fresh water stream above tide water, carries the title to the center of the channel— *ad filum aquæ*—is not applicable to lakes and natural ponds. There is no reason why it should apply to them. In running streams it is desirable and necessary for the public interest that the riparian owner should own to the center of the stream, so that the power derived from the fall of water may be made useful. It is impossible to apply the rule to lakes or ponds. They have no current or channel. There is no *filum aquæ*. These lakes may be circular, oblong or irregular, with deep bays, and they are capable of being entirely surrounded with riparian owners, at the ends as well as sides. To ascertain the rights of such owners under this rule would be impossible. (3.) It is therefore settled by authority, that

conveyances bounding the premises by lakes and natural ponds, convey the title only to low water mark. (*Murray* v. *Seaman*, 1 *Hawks*, 56. *Wood* v. *Kelly*, 30 *Maine Rep.* 47. *Bradley* v. *Rice*, 13 *id.* 198. *State* v. *Gilmanton*, 9 *N. H. Rep.* 461. *Canal Com'rs* v. *People*, 5 *Wend.* 423, 447. 19 *Barb.* 491. 17 *Wend.* 571. 13 *Pick.* 261.) (4.) But if the rule would apply, more than three-fourths of the lot would belong to the plaintiff.

. II. The undisputed facts of the case show that the fee of the *locus in quo* is in the plaintiff. (1.) There was no dispute, upon the trial, but that the patent from the state and the other conveyances set out in the case were in fact executed as therein stated. (2.) It is not denied but that the land in dispute lies within the boundary lines, as set out in the patent to Edwards ; and by mathematical calculation, it appears that the quantity (15,000 acres) calls for the whole space embraced within the lines. It is not necessary to prove by witnesses a fact which may be ascertained by mathematical calculation. Courts are presumed to be capable of making such calculations. "That is deemed certain which may be rendered certain." In the patent there is a mistake in the description, of 100 chains in the west line, which can readily be ascertained and corrected by the other lines and angles given. Correcting the mistake, the boundaries would contain just about 15,000 acres. (3.) Whether, therefore, the fee of the land under water passed to the grantee in the patent or not, was a question of law under the evidence, and we are not concluded, by the referee's finding, that it did not pass. (4.) Assuming that the same rule should be applied in this case which is applicable to tide waters, the fee of the land under water contained within the boundaries of the patent would pass to the grantee therein. "When a patent or grant conveys a tract of land by metes and bounds, the land under water, as well as other lands, will pass if the land under water lies within the bounds of the grant." (*Rogers* v. *James*, 1 *Wend.* 237.) This doctrine was applied in the above case

expressly to a grant containing within its boundaries an arm of the sea. The grant in that patent, as given in the case, did not convey *all the lands under water*, as the learned referee assumes in his opinion, but described the premises granted by metes and bounds in the ordinary manner. The only difference between tide waters and fresh water streams in this respect is, that lands under the former will not pass by implication; but when they are clearly included in the boundaries, they will pass. (*Rogers* v. *James, supra. Child* v. *Starr,* 4 *Hill,* 369. 2 *Black. Com.* 19. *Champlain R. R. Co.* v. *Valentine,* 19 *Barb.* 484. 3 *Kent's Com.* 427.) The sovereign, at common law, could dispose of the soil under navigable waters at will. (*Comyn's Dig., Navigation B. Prerogative D,* 88.) The state has succeeded to the rights of the crown, and has vested in the commissioners of the land office the general power to direct the granting of unappropriated lands. This power was unrestricted, as to lakes, until 1815, and the act of that year was a restraining and not an enabling act, and therefore no previous want of power can be predicated upon the passage of that act. (5.) But if it be conceded that the patent to Edwards would not pass the land under water, under the rule applicable to tide water, still we insist that such a rule is not applicable to this case. Whatever might be the rule applicable to our large navigable lakes, or inland seas as they have often been termed, the beds of small lakes and ponds of the size and character of Cazenovia lake would manifestly pass by grants containing them within their boundaries. Cazenovia lake is not navigable, within the meaning of the term as used in the statute. That term is applied to those lakes or inland seas which constitute the great highways of commerce and travel. (1 *R. S.* 208. 17 *Wend.* 621.) But no commerce or travel ever passed over Cazenovia lake, at least in the summer time. It is of the same character as the thousands of lakes which lie so thickly scattered over our state, especially in the northern portions of it, and which may be more appropriately termed

ponds than lakes. In regard to them, they are not noticed in the lines of lots or townships, and are almost universally included in the computation of the amount of land conveyed or granted. (1 *Wend.* 237. 19 *Barb.* 491.) In the numerous patents and state certificates and comptrollers' deeds of lands in the northern wilderness, which have been issued by the proper authorities, not one, it is presumed, can be found in which these small lakes or natural ponds have not been deemed as passing with the land, and have not been embraced in the computation of quantity. (1 *Wend.* 237. 19 *Barb.* 49.) There is no reason why any restriction should be put upon granting the lands covered by them. Being navigable only in a limited sense, and in nowise constituting highways of commerce and travel, no public docks or wharves are required upon their margins. If the land under our navigable fresh water streams is the subject of private ownership, and passes by grants embracing it within their boundaries, like other lands, no good reason can be shown why the land under these small lakes or ponds should not be subject to like rules. (5 *Wend.* 447. 17 *id.* 621. 20 *id.* 149. 19 *Barb.* 491. 4 *Hill,* 369.) It is therefore submitted, that the title to the bed of that part of the lake contained within the lines of the patent, passed to Edwards the patentee. (6.) If the bed of the lake is vested in the plaintiff, upon its being reclaimed, it of course still continues vested in him, unless it has been appropriated by the state.

III. The land in question has never been appropriated by the state. (1.) Neither of the resolutions introduced appropriates the land in question. (2.) The canal commissioners are the only persons authorized by law to appropriate lands for the use of the canals. The canal board approves the plan, but the canal commissioners make the appropriation. (1 *R. S.* ch. 9, *title* 9, §§ 16 *to* 19.) (3.) There is no pretense that any of the formalities necessary to vest the title to the lands of individuals in the state have been observed by the canal commissioners. (4.) Even if it had been their design to ap-

propriate the lands to the uses of the canal, the title would not vest·in. the state until the damages were appraised and paid. (19 *Barb.* 263.)

IV. There was nothing done by the plaintiff during the progress of· the work which could create an estoppel. (1.) The mere filling up the space with earth, he did not then nor does he now find fault with. (2.) He said nothing calculated or designed· to mislead. (3.) The defendant must be deemed to know the law, and was as well acquainted with all the facts as the plaintiff. He could not therefore be legally misled·by· the silence of the plaintiff. To constitute an estoppel *in pais* against a party, his conduct must be such as to lead the opposite party into a course of conduct prejudicial to his interest, if the former party be allowed to retract. (8.*Wend.* 483.) The evidence in this case fails to show that the defendant was misled, or that his conduct was influenced in.the slightest· degree by any thing which the plaintiff said or did. Knowing all the facts of the case, the defendant came to the conclusion that the legal title was either in himself· or the state, and acted accordingly. The conduct of the plaintiff had no influence upon his mind in arriving at such conclusion.

V. The plaintiff, therefore, being vested with the title to the land in dispute, was clearly entitled to recover in the action. (1.) The complaint sets out the facts, and alleges title in the plaintiff. He was, therefore, notwithstanding the prayer for relief, entitled to recover the possession of the land in dispute. (*Code,* § 275.) (2.) No question was made upon the trial as to the form of the pleadings. Indeed, all matters of form not affecting the merits were waived by both sides. (3.) The defendant cannot, therefore, object that the relief granted was less than that to which the plaintiff was entitled. (4.) Again, the title to the land being in the plaintiff, if he chooses to leave it open to the public, he has the right to restrain by injunction a trespasser from incumbering it with any thing injurious to himself or the public. (5.) The

injury being continuous in its nature, the proper remedy is by injunction.

VI. But even if the land in question belonged to the state and was public land, the plaintiff, being a riparian owner, and suffering special injury, has a right to restrain the defendant from taking exclusive possession of the land and erecting and continuing an obstruction to his property and his enjoyment of the lake. (1.) Assuming that the lake, embracing the water and the land underneath, belongs to the public, the whole people have a common right to the use of it for fishing, boating, skating, &c., and any encroachment upon it is a wrong to the public. (5 *Peters,* 431. 12 *Wheat.* 582. 4 *Paige,* 510. 6 *Hill,* 407. 10 *Peters,* 662. 22 *Wend.* 423.) (2.) The lands of the riparian owners are very much enhanced in value in consequence of their proximity to the lake, not only from the facilities which the proprietors enjoy for skating, fishing, boating, &c., but from the beauty of the views and prospects which the lake affords. (3.) The latter consideration enters into the beneficial enjoyment of the lands upon the borders of lakes and other waters, and affects directly and materially the money value of them. Land is affected materially in value by its location, by its proximity to public waters, and by the beauty or grandeur of the surrounding scenery. In the selection of a farm upon which the proprietor designed to reside, thousands of dollars have been paid for that which does not add one iota to its productive qualities, but in consideration of its contiguity to a lake, a river, or a cascade. Many farms have been sold on the Hudson river, and on the many beautiful lakes in the state, for several hundred dollars per acre, which, in other locations with the same fertility of soil, would not bring one-fourth of the money. Mere utility constitutes but a small portion of that which enters into the value of every thing used by man. Beauty often, rather than utility, fixes the standard of value. A horse, a carriage, a building—every thing for the use of man—is materially enhanced in pecuniary value by its adapt-

ation to please the eye and gratify the taste. Moreover, as a community rises in the scale of civilization and refinement, more and more prominence is given to the beautiful, and less to the merely useful—more is paid for the gratification of the ideal, and less for the gratification of the sensual. Indeed, a fine painting by a master, of the landscape which is destroyed by the defendant, would be valued in dollars by its thousands. (4.) The referee has found in this case that the trees, if permitted to grow, will materially reduce the value of the plaintiff's farm, and the finding is well sustained by the evidence.

VII. The plaintiff suffering special injury from the wrongful acts of the defendant, it is submitted that it comes within the most obvious principles of the jurisdiction of a court of equity, to restrain him from continuing the injury. (1.) The defendant is a wrongdoer and trespasser upon the public property. (2.) His wrongful acts, if continued, will injure materially the property of the plaintiff, lessen its value for sale, and the enjoyment of it while it continues his own. (3.) It is therefore a special injury in consequence of a wrongful act to a public right. It is not perceived why it does not come directly within the cases where an action on the case for damages—when that will afford adequate relief—can be sustained; and when an action for damages will not afford adequate relief, as in this case, a remedy by injunction will be granted. (7 *Cowen,* 609. 8 *Paige,* 351. 9 *id.* 575. 3 *Sandf.* 120.) (4.) Suppose a person, without right, should erect in front of some one of the beautiful residences upon the Hudson river, or upon Otsego or Seneca lakes, a high fence, or some other obstruction, shutting out entirely from the mansion the view of the water, will it be claimed that the proprietor would have no remedy in a court of justice?

VIII. It is also submitted that the principle upon which we claim to sustain the decision of the referee in this case is not new, but is established by repeated adjudications. (1.) In the case of *Corning et al.* v. *Lawrence,* an injunction was

granted to restrain a defendant from obstructing a street in the city of New York, by building a house upon it. As there was a special injury to the plaintiffs, by affecting the enjoyment of their property in the vicinity, and the value of it, it was held that the plaintiffs were entitled to the injunction. In *Cady* v. *Conger*, (19 *N. Y. Rep.* 256,) it was held, that where there was no municipal corporation to assert the general right of the public, an individual proprietor of land fronting on a public green might maintain an action to prevent its perversion from its public uses. The learned judge who gave the opinion of the court, held that where a dedication is made of a public green or park, individuals are invited to build, improve, and make other arrangements of life and business in reference to such public rights ; and the rights thus resulting to individuals may be enforced by them. So in the case at bar, if we assume that upon the sale of the lands around this lake, the lake itself was reserved for public uses, the land was purchased with a view to such uses, and no mere trespasser should be allowed to pervert any portion of it from such public uses. (*See also* 22 *Wendell*, 473 ; 8 *Paige*, 351 ; 9 *id.* 575 ; 3 *Sandf.* 126 ; 4 *id.* 502 ; 2 *Barb. S. C. R.* 577 ; 2 *John. Ch.* 162.) In the case of *Cady* v. *Conger*, it was the view mainly to be affected. That was not so strong a case as this, for in that case there was no direct obstruction to the view, but a building was proposed to be placed upon the green, injuring its appearance. The injury was in nowise as direct as in the case at bar. (2.) If the defendant had kept up a nuisance, even on his own land, offensive to the smell, no one would claim that the plaintiff could not restrain him. It is not perceived why a nuisance offensive to the sight should be treated more tenderly. (8 *Paige*, 351. 9 *id.* 575.) (3.) It is conceded, however, that an action does not lie for placing an obstruction to the prospect of another upon one's own premises. It was so held in a case cited in *Aldred's case*, (9 *Coke*, 57;) still the great value to a home of a fair prospect was there recognized. So

in *Atty. Gen.* v. *Doughty*, (2 *Vesey, sen.* 453,) the right to restrain by injunction the obstruction of a prospect, in some cases, is clearly recognized.

CAMPBELL, J.   The rights of the parties in this action depend on the decision of the question of ownership of the land on which the defendant planted the trees.   The plaintiff claims that the title is in him, or if not in him, then in the people of the state.   The defendant insists that he is the owner, and as such had perfect right to use it as he has done, and to plant trees thereon, even though in their future growth they should in some degree obstruct the plaintiff's view of that beautiful lake of Cazenovia.   This lake is about five miles long, and three-fourths of a mile wide, has no current and no main inlet.   The land lying along its shores is mostly improved, and used as farming land.   Elegant mansions have been erected, and the region of country is healthy and beautiful.   But this lake, in my judgment, is in no legal or just sense of the term navigable water.   It is not, in the language of Lord Hale, a highway " for a man, or goods, or both, from one inland town to another."   It is too small to be of any practical use in navigation, except it were as a connecting link of some internal improvement.   The state took no notice of its existence in the patent granted to Edwards.   The northern line of that patent crossed the lake north of the land in dispute, and this land was embraced within the boundaries of the grant.   There is no restriction or exception of the lake, no reference to it, no reservation of the water or land under water.   The grant under that patent carried the southern portion of this lake as completely to Edwards as the patent to Zephaniah Platt passed to him the title to a portion of the Saranac river.   (*See People* v. *Platt*, 17 *John.* 195.) The defendant derives his title remotely from John Linklaen, one of the grantees of Edwards the patentee, and his premises, in that deed, dated in 1804, as well as in the subsequent deeds, are bounded on the west and south by the lake and

outlet thereof. Under these deeds the premises of the defendant have been held and possessed, and for nearly forty years past by the defendant and his father. Under these deeds the title of the defendant extends "*usque ad medium filum aquæ.*" It was not a *limited grant.* The premises of the defendant are not bounded on the west by the *bank* of the lake, but are bounded by the lake itself. There is no intent manifested on the face of the deed of the grantor to restrict his grant. The deed would have the usual legal effect, and as an appurtenance would carry along the land under water to the center; at all events it would carry the right to the land filled in, where the water was shallow, immediately in front of the defendant's premises. (*See opinion of Walworth, chancellor, as to boundaries, Canal Appraisers* v. *The People,* 17 *Wend.* 599.) In my judgment, under this view of the case, the defendant is the unqualified legal owner of the premises.

But taking another view, and assuming that this lake is navigable water, and that the title to the land under water did not pass under the patent to Edwards, but was reserved by the state, then how stands this action? In such cases, how does the state hold the title where it has sold and conveyed away all the land bounded by the lake or river, and where the riparian proprietors stand face to face with their feet touching the outer edge of the water? "It is," says Chancellor Kent, (3 *Com.* 545, *9th ed.*) "a settled principle in the English law, that the right of soil of owners of land bounded by the sea or on navigable rivers, where the tide ebbs and flows, extends to high water mark; and the shore below common but not extraordinary high water mark belongs to the state as *trustee* for the public." It may be added that in New York, the state long ago, and immediately after the revolutionary war, declared herself also a *trustee* for the owner of the adjacent lands. By our present statute the commissioners of the land office may grant land under navigable lakes and rivers, when necessary for commerce or proper

for the purpose of beneficial enjoyment of the same by the adjacent owner; "but no such grant shall be made to any person other than the proprietor of the adjacent lands, and any such grant that shall be made to any other person shall be void." (1 *R. S.* 5th ed. 552.) The state then is trustee for the public of the land under water in navigable lakes and rivers, so as to protect navigation and prevent hindrances or obstructions; on the other hand she declares herself trustee for the riparian proprietor, and that grants are to be made to him alone, and that they will be made not only for purposes of commerce, but when proper for the beneficial enjoyment of his adjacent lands. Then when the proper and constituted authorities of the state proceeded to deepen the outlet of the lake, and deposited the stones and earth that were removed, in the shallow water in front of and adjacent to the defendant's premises, it was a visible and public declaration that this portion of the lake could no longer be used for navigation. The defendant entered into possession, and the trusteeship of the state, both for the public and the riparian proprietor, was virtually at an end. It is true that no formal grant was made to the defendant. But the land became eminently proper, and not only proper but necessary, for the beneficial enjoyment of his adjacent premises. There arose, if not a legal at least a strong equitable title, which, coupled with actual possession, no one except the state herself should be allowed to dispute. I cannot agree with the able and learned referee who tried this case, that the land remained a highway. Under the civil law it is very likely it would have been so, but not under the common law. "In the civil law the banks of public rivers, and the sea shore, were held to be public." (3 *Kent's Com.* 543.) At this day, men and horses may be seen on the banks of the Rhine towing boats up its oft rapid waters, following in paths which have been thus trod for ages, and protected under customs and laws which had their origin in remote centuries, when, before the Christian era, the legions of Julius Cæsar pitched their tents, and

Ledyard *v.* Ten Eyck.

built their towns, and flaunted the victorious Roman eagles in the vallies and on the hills which adjoin and bound that beautiful river. But such was not the common law, either in England or in this state. The public here have no highway along the margin of our navigable rivers and lakes, unless the same has been acquired by express grant or prescription. In any view of this case which I have been able to take, the plaintiff cannot maintain this action. If the defendant is the legal owner of the land, the plaintiff is remediless; if he is the equitable owner in possession, then no stranger can interfere with him.

This action is brought on what may be termed the equity side of the court. The planting of the trees, and obstructing the plaintiff's view of the lake, may not be neighborly. Of this I have no knowledge. Whether it is necessary or desirable for the protection of the defendant's property, or for its better enjoyment, does not appear. These matters we cannot regulate. In my opinion the judgment must be reversed, with costs to abide the event,

PARKER, J. concurred.

BALCOM, J. dissented.

[BROOME GENERAL TERM, January 28, 1862. *Balcom, Campbell* and *Parker*, Justices.]