# SAUNDERS v. N. Y. CENTRAL, ETC. R. R. CO.

*Supreme Court, Special Term, Westchester County; February*, 1893.

1. *Real property ; land under water.*] A railway company projected its railway across a small shallow bay of a navigable river, and subsequently without right filled in a portion of the bay on the shore side of its road.—*Held*, that the filled-in land, although the work of man and not the result of natural causes, was accretion belonging to the upland owner.

2. *The same.*] In such case, the right of the upland owner to access to the river across the land so filled in, and his other rights thereto as riparian proprietor, were not limited or terminated by his having conveyed to the railway company for the purposes of a railway, the strip across the bay upon which the railroad was originally built, especially as the deed thereof expressly reserved the rights of the upland owner below high-water mark.

3. *Deed; reservation.*] The deed of a riparian owner of land upon a navigable river, conveying to a railway company for the purposes of a railway, a strip of land under water in front of his upland, reserved the grantor's rights to land below high-water mark, except the strip conveyed.—*Held*, that the rights reserved were appurtenant to the upland, and that such reservation was

valid. *So held,* as to land under the Hudson River, to which the grantor had not obtained a patent at the time he made the conveyance containing the reservation.

4. *Constitutional law.*] *It seems,* that the people of the State as successors to the rights and powers of the king and parliament of Great Britain over navigable waters and the land thereunder, excepting the right to regulate commerce and navigation surrendered to the United States, are invested with title to such waters and land thereunder subject to a trust to hold the same for the benefit of the public ; and that the property so held can not be alienated by the State except in the execution of the trust in the interest of the beneficiary.

5. *Grants.*] *It seems,* that a grant by the State of thousands of acres of land under water, extending along the entire length of one of the shores of a navigable river, to a railroad company, is in contravention of the implied trust under which the State holds such land for the benefit of the public and is invalid.

6. *The same.*] A grant without reservation by the State to a railroad of land under water, along the shore of a navigable river, is void in so far as it contravenes the right of access to the navigable water of the river and the other privileges of riparian owners.

Trial by court without a jury.

Action by Leslie M. Saunders and Alexander Saunders against the New York Central and Hudson River Railroad Company to restrain defendant from maintaining and operating its railroad upon filled-in land alleged to be owned by plaintiff, situated at Yonkers, N. Y., between the railroad embankment of defendant and the original high-water mark of the easterly shore of the Hudson River.

The further facts are fully stated in the opinion.

*Ralph E. Prime,* for plaintiffs.—I. Notwithstanding the ownership or interest of the people in lands under navigable waters, the riparian owner has, in the land and water which is between the shore and the navigable channel, rights which the constitution calls property and protects (citing Rumsey *v.* N. Y. & New England R. R. Co., 133 *N. Y.* 79 ; overruling Gould *v.* Hudson River R. R. Co., 6 *Id.* 522).

II. The interest or title of the people or sovereign in such lands is not beneficial, but purely administrative for the purposes of regulation and superintendence only (citing 4 *Proudhou's Public Domain;* 37 *Am. Jurist,* 121 ; 2 *Kent Com.* 339, note d ; *Angel on Tide Waters,* 17, 135 ;. Illinois Central R. R. Co. *v.* State of Illinois, 13 *Sup. Ct.. Rep.* 110 ; Smith *v.* Levinus, 8 *N. Y.* 472 ; Stockton *v.* Baltimore & N. Y. R. Co., 32 *Fed. Rep.* 9 ; Martin *v.* Waddell, 16 *Peters,* 367 ; Providence Steam Engine Co.. *v.* P. etc. S. S. Co., 12 *R. I.* 348 ; s. c., 34 *Am. Rep.* 652).

III. A riparian owner has a right of access to the navi-- gable part of a river, to erect wharfs on the soil under water, etc., subject only to the public right of navigation (citing *Corp. Jur. Civ. Dig.* L. 43, T. 15, § 1 ; *Id.* 43, T.. 8, § 8 ; *Angel on Tide Waters,* chap. 7, 8 ; Buccleuch *v.* Metropolitan Board, 5 *E. & I. Appeals,* 418 ; Bell *v.* Gough, 3 *Zabriskie,* 624 ; Burrows *v.* Gallup, 32 *Conn.* 493 ; Doane *v.* Broad St. Asso., 6 *Mass.* 332 ; Boston & Roxburgh Mill Co. *v.* Newman, 12 *Pick.* 467 ; Lapish *v.* Bangor Bank, 8 *Greenleaf,* 85 ; Ball *v.* Stack, 2 *Wharton,* 508 ; Ride *v.*. Ruddiman, 10 *Mich.* 125 ; Commonwealth *v.* Shaw, 14 *Serg. & R.* 9 ; Harrison *v.* Sterritt, 4 *Harris & McHenry,*. 540 ; Providence Steam Engine Co. *v.* Providence S. S. Co.,. 12 *R. I.* 348 ; 1875, *Senate Document* 37 ; Yates *v.* City of Milwaukee, 10 *Wall.* 497).

IV. The trust upon which the sovereign or people holds title to land under water, is like the trust of a city for the streets held by it in fee, which is not only for the benefit of the public, but also for that of the adjoining owners (citing Kane *v.* N. Y. El. R. R. Co., 125 *N. Y* 164 ; Story *v.* N. Y. El. R. R. Co., 90 *Id.* 122 ; Steers *v.* City of Brooklyn, 101 *Id.* 51 ; Matter of Yonkers, 117 *Id.* 574).

V. The plaintiffs, notwithstanding the conveyance to the railroad of a strip of land along the river front, had a right to cross the railroad in order to obtain access, (1) to the navigable waters of the river ; (2) to their land under

water on the river side of the railroad; (3) to such wharfs. as they might build (citing Clarke v. Rochester, Lockport & N. F. R. R. Co., 18 *Barb.* 350; Smith v. N. Y. & Oswego Midland R. R. Co., 63 *N. Y.* 58; Wademan v. Albany & S. R. R. Co., 51 *Id.* 568; Wheeler v. Rochester & Syracuse R. R. Co., 12 *Barb.* 227).

VI. The remedy by injunction is the correct remedy (citing Rumsey v. N. Y. & New England R. R. Co., 114 *N. Y.* 424; *Id.* 134; *Id.* 79; Henderson v. N. Y. Central, etc. R. R. Co., 78 *Id.* 423, 430; Corning v. Troy Iron & Nail Factory, 40 *Id.* 191).

*Ira A. Place* (*Frank Loomis*, attorney) for defendant.—I. The title of the State could not be divested by the filling in of the parcel by the upland owner (citing People *ex rel.* Blakslee v. Commissioners of the Land Office, 135, *N. Y.* 447; S. C., 48 *State Rep.* 432).

II. The right of access, if any, of the plaintiffs from their uplands to the waters of the Hudson river was. determined and limited by the deed of the common grantor of both parties, conveying to the defendant a strip of land along the river front (citing Blakslee Manuf. Co. v. Blakslee's Sons Iron Works, 129 *N. Y.* 155; Rum- sey v. N. Y. & New England R. R. Co. 135 *Id.* 79).

III. The patent to defendant was valid (citing N. Y. Central, etc. R. R. Co. v. Aldridge, 135 *N. Y.* 83; S. C., 48 *State Rep.* 373).

DYKMAN, J.—The plaintiffs in this action are upland owners on the east bank of the Hudson river at Yonkers. The Hudson River Railroad Company was incorporated as a body politic and corporate by a special law in May, 1846, with power to construct and operate a railroad from New York to Albany. At that time Ethan Flagg was the owner of the upland now belonging to the plaintiffs, and there was a small bay in front of the land, across which the railroad was projected; and Ethan Flagg gave

a deed of conveyance to the railroad company August 13th, 1847, for a strip of land seventy-three feet wide and ten hundred and thirty-seven feet in length. The Hudson River Railroad Company constructed its road across the bay upon the land covered by the deed from Ethan Flagg. Thereafter the Hudson River Railroad Company became consolidated with the New York Central Railroad Company under the name of the New York Central and Hudson River Railroad Company. Subsequent to such consolidation, the defendant made a filling on the east side of the strip included in the Flagg deed, and in 1882 laid down a railroad track east of the original track, and in 1888 laid down another track still further east, and both these tracks extend along the whole front of the plaintiffs' upland. At this time the whole of the bay from the original high-water line west to the original railroad embankment is all filled in with earth so as to exclude the water. Some of that filling was made by the defendant and some by the owner of the upland. The precise quantity of filling done by each is not stated definitely. Since the two extra tracks were laid down, they have been used by the defendant in its business. Its yard is there and large cars are run there and remain upon the tracks for different periods of time. This action is brought to restrain such use and compel the removal of the two tracks so laid down east of the original road bed of the defendant and in front of the upland of the plaintiff. In December, 1873, the defendant obtained from the commissioners of the land office letters patent for a grant of land under water on both sides of the original bed of the Hudson River Railroad from New York to Albany, containing many thousands of acres of land, and including the land upon which the two tracks above mentioned were laid.

These are the substantial and basal facts upon which the questions involved in this action are to be determined. The questions are interesting but intricate, and their

ABBOTT'S NEW CASES. 93

Saunders *v.* N. Y. Central, etc. R. R. Co.

examination affords a wide scope for research and requires careful discrimination and analization. It will be orderly to determine first the rights of the plaintiff as riparian or littorial proprietors, and that inquiry can now proceed without embarrassment from the case of Gould *v.* The Hudson River Railroad Company (6 *N. Y.* 522), which, after repeated attacks from flank and rear, has now received an assault in front from the court of appeals and been overthrown (Rumsey *v.* N. Y. & New England R. R. Co., 133 *N. Y.* 79). This case can therefore be determined in the light of authority upon principles more consonent with reason and justice.

The rights of riparian proprietors to the water flow from the contiguity of their land thereto. They have the right of access to the navigable part of the river from the front of their land, the right to make a landing or wharf subject to the rights of the public, the right of fishing and landing and of accretion (Yates *v.* Milwaukee, 10 *Wall.* 497). They may also fill up shallow water in their front, and upon such reclaimed land construct wharves, so long as they do not infringe upon the rights of navigation (Dutton *v.* Strong, 1 *Black.* 23). Under the civil law they might project a mole in the sea. These rights and privileges constitute property which is under the protection of the constitution and the laws, and which cannot be impaired or destroyed without compensation.

In this case the right of accretion is important because the rule is the same whether the accretion is natural or wrongful, whether it results from natural causes or the work of man (Steers *v.* City of Brooklyn, 101 *N. Y.* 51). Justice can be done to the littorial owner in no other way. Accretion, whether natural or wrongful, must belong to the upland owner, or he will be excluded from the water and changed into an inland instead of a riparian owner without his assent.

If that rule of law enumerated in the Steers Case is applicable here, it is difficult to see why the accretion in

front of the upland of the plaintiff did not vest in them and their predecessors in title. If the wrongful construction of a wharf in front of the old shore in that case was viewed as accretion, which went to the riparian proprietor, because it was between him and the river, it is difficult to see why the filling-in here should not have the same result, and accrue to the benefit of the upland owners. In each case the access of the owner is similarly affected, and unless his rights are extended to the new shore, he is converted into an inland owner and deprived of the important and valuable rights of a littorial owner without compensation.

In the case of Ledyard *v.* Ten Eyck (36 *Barb.* 126) the defendant owned the land on the east shore of Cazenoria Lake in this State and the canal commissioners excavated the outlet and deposited the material in the shallow water in front of his premises. The defendant took possession of the reclaimed land. The court said the trusteeship of the State, both for the public and the landowner, was at an end, and the land became necessary for the beneficial enjoyment of the upland, and thus arose, if not a legal, at least a strong equitable title which with the possession should not be disputed except by the State itself. That case favors the contention of the plaintiff.

I think the doctrine of the Steers case is applicable to this, and that the right of access of the plaintiff is extended to the new shore formed by the railroad. I intend to rest my decision on this branch of the case, upon the right of the plaintiffs as riparian proprietors, independent of the rights they may have as owners of the land under water west of the railroad.

The defendant contends that the plaintiff's right of access to the river was terminated or limited by the execution and delivery of the deed from Flagg to the railroad company for the strip of land across the bay, but the deed can have no such operation. At most that deed conveyed that strip of land, and that only for the use of the

road, for the purposes expressed in its charter, and the grantor surrendered none of his rights with which he was clothed as upland owner (Railroad Company *v.* Aldridge, 135 *N. Y.* 83). Moreover, the grantor reserved to himself and his heirs and assignees all his and their rights to the land below high-water mark except the strip so conveyed, and unlike the reservation which was condemned in the Blakslee case,* because the right is regarded as appurtenant to the land and cannot exist if severed from the ownership thereof, this reservation was valid because the grantor remained the owner of the upland and reserved the right as appurtenant thereto.

The case of Buccleuch *v.* Metropolitan Board of Works (*L. R.* 5 *H. L.* 418) was this. The Duke of Buccleuch was the owner of land on the bank of the river Thames through which a road was constructed along the shore of the river under an act of parliament which cut off his access to the river, and it was decided by the House of Lords that he was entitled to compensation not only for the land actually taken for the construction of the public road, but also for the permanent damage to the whole property in consequence of its change from river-side to road-side property, including his particular right to use the shore of the river. That case seems to be a direct authority in favor of the plaintiff here.

The defense to this action is based upon the right bestowed upon the Hudson River Railroad Company by chapter 30 of the Laws of 1848, to alter its line and file a new map and acquire the land embraced in the new location, the filing of such new map, and the grant from the commissioners of the land office in 1873. It is to be said of this grant preliminarily that it was for railroad purposes only, and the company could take it for no other purpose; and Judge BROWN in his opinion in the first Rumsey case (114 *N. Y.* 432) took pains to show how

---

* Blakslee Manuf. Co. *v.* Blakslee's Sons Iron Works, 129 *N. Y.* 155.

adequate provision was made to give every upland owner easy access to the water and preserve to such owners their access to the river.

There are, however, other reasons why this grant can have no operation which will abridge the rights of riparian owners along the east bank of the Hudson river. By the common law of England the title to the soil under navigable waters was in the crown, and the control over such waters rested in the British Parliament, but by the revolution and the separation of the States from the crown, the title to the bed of navigable waters, which before that rested in the crown, was transferred to the people of the State by the revolution, as the successor of their former sovereign. At the same time the people in their sovereign capacity became vested with the absolute control over rivers which before rested in the British Parliament, but surrendered the power to regulate commerce and navigation to the Congress of the United States in 1778 by the adoption of the Federal Constitution. So that now, through its legislature, the people may exercise all the power over navigable waters and the soil upon which they lie which could have been exercised by the king in conjunction with parliament previous to the revolution subject to the restrictions imposed by the Constitution of the United States, and no more.

We must now inquire what those powers of the crown and parliament were. It was determined in England at a very early period, that the title to property in the soil under tide-waters was vested in the king as the representative of the public for the public use, and after Magna Charta at least he never had the authority to make an exclusive grant in an arm of the sea. It was laid down by Bracton that those things which related particularly to the public good could not be sold, and that rule was based upon principles of public policy. The sea and the navigable rivers are the natural highways of the world, and although the sovereign may make grants of the soil for

certain purposes, yet such grants are subject and subordinate to the paramount right of the public, and there is even an implied reservation of such public right in all such grants. As the people of the State succeeded to the rights of the king and parliament they took no greater rights.

The distinction is between the " domain of the State," which is the property of which the people have the absolute estate like an individual, and the "public domain," which the State holds as a mere trustee for the use of the public and " which remains in the state of primitive indivision " (2 *Kent Com.* 339). The former applies to things in which the State has an absolute property, and the latter to the property which the State holds as trustee for the public, such as highways and navigable streams. In the latter case the State holds only " a regulating power for the purposes of protecting the public in the use of the waters for navigation and other public purposes, and of this power and duty of regulation the State cannot divest itself."

" It is equally true that the riparian proprietors have certain rights and interests which are valuable, and of which they cannot be deprived, except under the exercise of the rights of eminent domain. Among those rights are the rights of access to the navigable river or sea from the front of his lot ; the right to make a landing, wharf, or pier for his own use or the use of the public, subject to the supervision of the State to see that it does not interfere with navigation ; the rights of fishery, of ferry, of towing on the banks, of landing, lading and unlading, the right of accretion, etc." (Report of Hon. Daniel Pratt, Attorney General to the Senate, January 28th, 1875). This quotation is not made because it has the force of authority, but because it expresses in terse language the doctrine which prevails in this State upon that subject.

The same doctrine is laid down by Angel, in his learned work on tide waters in these words: " Although the

king is regard edas the legitimate proprietor, yet his character in this respect is fictitious, inasmuch as he cannot exercise his ownership to the exclusion, inconvenience or injury of his subjects. He can, therefore, be considered only as guardian and trustee for the benefit of his subjects (*Angel on Tide Waters*, 135).

The same doctrine was laid down by the supreme court of the United States in the Chicago Lake Front case in the following language : "That the State holds the title to the lands under the navigable waters of Lake Michigan within its limits, in the same manner that the State holds title to soils under the tide water, at common law, we have already shown. . . . But it is a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States holds in the public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties " (Illinois Cent. R. R. Co. *v.* Illinois, 146 *U. S.* 387, 452).

A line of decisions which commenced with the celebrated Story case holds that an owner of land abutting upon a public street has a property right therein for access, light, and air, and that the State has no power to grant a railroad the right to occupy the street when such occupation affects injuriously the enjoyment of such rights, without compensation.

In the opinion of the court of appeals in the Rumsey case, in the 133 N. Y. reports, where the Gould case was overruled, it was said : " Unless there is some distinction to be made between the rights which pertain to an owner of land upon a public river and one upon a public street which is not perceived, then the principles sanctioned by this court in these cases virtually overrule the Gould case, as they are apparently irreconcilable. So far as

those cases relate to the right of access they are applicable to this case.

We have already seen that upon the declaration of independence in 1776 the people of each State became sovereign, and in that character became invested with the absolute right to all navigable waters and the soil upon which they rested for their own common use, and such title was held by the State in its sovereign capacity in trust for the public, and continued to be so held and owned in such trust capacity until 1788, when it surrendered the right to control the waters for purposes of commerce and navigation. But it surrendered nothing more. It still remains the owner of the soil and can make grants of the same within the restrictions of the statute, but the extent of the grant in question is almost sufficient of itself to prove that its execution was in contravention of the trust under which the property is held.

The trust is governmental and the property cannot be alienated except in the execution of the trust in the interest of the beneficiaries. It cannot with any propriety be claimed that the surrender of a strip of land containing thousands of acres from New York to Albany to a trading corporation, is in the interests of the public. The size of a similar grant did not escape the attention of the supreme court of the United States in the case of the Illinois R. R. Co. *v.* Illinois (*supra*), and in relation thereof it was said in the opinion : " We hold therefore that any attempted cession of the ownership and control of the State in and over the submerged lands in Lake Michigan, by the act of April 16, 1869, was inoperative to affect, modify, or in any respect control the sovereignty and dominion of the State over the land, or its ownership thereof."

It is not necessary for me to hold this grant void, except so far as it contravenes the rights of these plaintiffs, and my conclusion is that their rights remain unimpaired.

It must be borne in mind that the right of access is an exclusive right of the riparian proprietor, and the grant in

question assumes to convey a strip of land in front of the east shore of the Hudson River without any reservation in favor of shore owners, and thus deprive them of their exclusive rights of access to the water.

My conclusion, therefore, is that the grant in question is unavailing against these plaintiffs, and their exclusive right of access to the water, and the obstruction of which they complain must be removed, and they must have judgment therefor.