# NORFOLK COUNTY.

## INHABITANTS OF WEST ROXBURY *vs.* ENOS M. STODDARD & another.*

Great ponds, containing more than ten acres, which were not before the year 1647 appropriated to private persons, were by the colony ordinance made public, to lie in common for public use.

This ordinance applied to all these ponds, whether at that time included within the territory granted to a town, or to any body of proprietors for the plantation of a town, or not then granted by the government of the colony, if they had not then been appropriated to particular persons, either by the freemen of the town, or by the general court.

Actual possession of a great pond by a town, sufficient to enable them to sustain an action against individuals for trespass in cutting ice therefrom, is not shown by proof of several votes of the town, at long intervals from each other, regulating the use of the water for mills, or of a recital, in a remonstrance to the legislature against the incorporation of an aqueduct company to draw water therefrom, of an ancient award by arbitrators, in a suit between individuals, that the drawing of water from the pond be regulated for the future by the selectmen of the town.

Fishing, fowling, boating, bathing, skating or riding upon the ice, taking water for domestic or agricultural purposes or for use in the arts, and the cutting and taking of ice, are lawful and free upon these ponds, to all persons who own land adjoining them, or can obtain access to them without trespass, so far as they do not interfere with the reasonable use of the ponds by others, or with the public right, unless in cases where the legislature have otherwise directed.

The town of West Roxbury have no such property in the ice on Jamaica Pond as will enable them to maintain an action against individuals for trespass in cutting ice therefrom, even if the fee of the pond be considered to be in the town.

The remedy for any unreasonable or excessive use of the liberty of cutting ice on a great pond, being the violation of a public right, is by indictment; and the towns may regulate the use of the ponds by reasonable by-laws, adopted and approved according to the statute; and if these are insufficient, resort must be had to the legislature.

TORT for breaking and entering the plaintiffs' close, described in the writ as Jamaica Pond, and carrying away eight thousand tons of ice, the property of the plaintiffs, for the purpose of selling the same.

At the trial in the superior court, before *Ames*, J., the plaintiffs introduced an act of the general court of the Colony of Massachusetts, passed May 25, 1636, (1 Col. Rec. 176,) under which they contended that the fee of Jamaica Pond and of the

---

* This case was argued in October 1862.

land beneath it was granted to the town of Roxbury; and also the acts of March 3, 1635, (1 Col. Rec. 172,) and of March 18, 1684, (5 Col. Rec. 470, 471); and the ancient records of Roxbury, containing the following votes and proceedings:

" The same day [Jan. 2, 1648] it was voted that those young men w have payd Rates to Towne charges and have had no land as yett Allotted to them shall by y^e 5 men have severall proportions allowed unto them out of such g [ground] as shal be found out not to be yett disposed of."

" At A Legall Meeting of the Freeholders and Other Inhabitants of the Town of Roxbury held At the Meeting House in the Easterly Parish in said Town the sixth day of March 169⅗, Liberty was granted to Mr. Joseph Belknap To drain or Draw water out of the pond to supply his Mill with water, he bringing in a brook to the said Pond to feed and bring water into The same; The Quantity or Depth of Water Being not Determined which he is to draw Of; Or Lower the Pond not being Decided But to be determined by the Selectmen afterwards when it doth Appear whether or How much any of the Neighbours may be Damnified thereby; And the said Belknap Being to Maintain the Highway Pasable And good where he Diggs."

In 1739, thirty-three inhabitants of Roxbury presented a petition to the selectmen setting forth that the mill of Mr. Belknap was first erected to grind corn for such families in Roxbury and Brookline as had their dependence thereon, and that some of the grantees of Mr. Belknap had fallen into the habit of grinding large quantities of wheat from Boston, and praying that the selectmen would take such proper methods, as that " None of the said grantees of Mr. Belknap his Heirs or Assigns should thereafter Draw any More water out of the said Great pond, but such Of them as shall and do Enter into Suffecient Obligations and penalties Effectually to Oblidge Themselves that they will from time to time use And improve the same for family Grinding Only; And that they will not Grind Wheat From Boston or Elsewhere, Unless it may be Done without any damage to such persons or Families in said Roxbury And Brookline As have or may depend on Grinding at the said Mill." Upon

this petition, the selectmen met, and drew up a report saying,
amongst other things: "And this Matter being of Great Impor-
tance, we Think it our Duty in faithfullness to the Town To
Determine vote and order as Followeth (that is to say) That
none of the said Grantees of Mr. Belknap Shall hereafter Draw
any more water out of the said Pond but such of them as shall
and do forthwith give Bond to the Town Treasurer with a Rea-
sonable penalty As Security to said Town and Neighbourhood
that They will not henceforth grind any more wheat From Bos-
ton or Elsewhere, unless it may be done without Damage to
such of the Neighbourhood In Roxbury and Brookline as do or
may Depend on The said Mill for Grinding as Aforesaid."

At the annual town meeting held May 19, 1740, "the Matter
Relating to the Great Pond Came under consideration And
was Loud Debated Upon, and was then propos'd whether The
Town would Approve of And Confirm The Report of the Se-
lectmen Respecting the same, And Voted in the Affirmative."

In 1783 certain inhabitants or owners of land in Roxbury pre-
sented their petition to the selectmen, complaining that large
quantities of water had been drawn from the pond of late years,
and the selectmen thereupon ordered that the proprietors of
the mill do immediately cease from drawing water out of the
pond, until the season will admit of taking an accurate view of
the same.

"At A Legal Meeting of the Freeholders and Other Inhabi-
tants of the Town of Roxbury Held att the Meeting-House in
the Easterly Parish in said Town the 3d day of March 1788.
The Petition of Mr. William Marshall being Read and consid-
ered, Voted, that the Selectmen, the Hon'ble William Heath,
Doct'r Eliphalet Downer, David S. Greenough, Esq'r, And Mar-
tin Brimmer Esq'r, be a Committee to take the said petition
into Consideration, View the Great Pond, The Mill, and the
Wells of water contiguous, And report At The Next Meeting
what is proper to be done Thereon."

At a meeting held April 7, 1788, the committee appointed by
the last vote submitted a report in favor of allowing Marshall
to draw water out of the pond on the following conditions, viz:

" that The trunk or Sluice for the drawing said Water be so placed, that the water in the pond shall not be Drawn more than six Inches lower Than its present Heigth,. And that a proper mark For that purpose be fixed by the Selectmen : And Provided that said Marshall be held to turn The Brook into said pond which was brought Into the same by Mr. Joseph Belknap in the year $169\frac{2}{3}$.

" The Foregoing Report having been read and Considered, the Question was put, whether The Town would Accept the same. And it Passed in the Negative.

" A motion was then made and Seconded That Mr. William Marshall have Liberty to draw Water from Jamaica Pond (so called) as Low As was Granted to Mr. Joseph Belknap in the Year $169\frac{2}{3}$. And the Question being put, it Passed in the Affirmative."

The plaintiffs also introduced the record of a judgment rendered in the supreme court in 1791, in an action brought by William Marshall against Martin Brimmer and another, which was referred to arbitrators, who were authorized " to determine and report in what way and by what rule the drawing the waters of Jamaica Pond by the said Marshall shall be regulated for the future." The arbitrators made an award in favor of the plaintiff, and also reported " that the drawing the waters from Jamaica Pond (so called) be regulated for the future by the selectmen of Roxbury, for the time being." No further facts in relation to the case or submission were disclosed.

On the 5th of September 1794, it was voted " that it is the unanimous Sense of the Inhabitants of the Town of Roxbury, that Drawing the waters From Jamaica Pond (for any other purpose than for the use of A Grist Mill for the Inhabitants of Roxbury, And Brooklyn, as heretofore granted to Mr. Belknap) will be injurious to the Inhabitants Of the Town of Roxbury in General And more Particularly to the Abuttors of the Pond (The Inhabitants of Jamaica Plains).

" The Town thereupon Voted That the Selectmen, Martin Brimmer Esq'r, David S. Greenough Esq'r, And Thomas Williams Jun'r, Be and hereby are A Comm<sup>ee</sup> To Appear before

the General Court At their Next Sessions in behalf of the Inhabitants of The Said Town of Roxbury to Enforce the Above Vote."

The plaintiffs also introduced in evidence a remonstrance of the selectmen of Roxbury to the legislature, with evidence that the same was taken from the files of the year 1795 in the office of the secretary of state, against the incorporation of the Jamaica Pond Aqueduct Company, reciting the votes of the town and referring to the case of *Marshall* v. *Brimmer*, and urging that the town have an exclusive right to the waters of the pond, and have never granted liberty to any person to draw water therefrom, but for the purpose of grinding corn for the use of the inhabitants of Roxbury and Brookline.

The plaintiffs also introduced in evidence a deed to them from the city of Roxbury, dated December 24th 1851, embracing the premises ; and called witnesses to show that the town, by its agents, reclaimed a part of the pond in 1856, and built a walk along the easterly shore, and stationed policemen to prevent bathing in any part of it during the daytime; that in January 1860 they posted up a notice near the defendants' icehouses, establishing boundaries within which ice might be cut, and took pains to see that their rights were not infringed ; that before any ice had been cut that winter they gave notice to Smith, one of the defendants, that the town would charge them for cutting ice, and had fixed bounds within which the defendants might cut, if they would pay for it; that when the defendants went upon the pond to cut the ice the agent of the town again informed them that they would have to pay for the ice, if they took it; that the defendants proceeded to cut and carry away about eight thousand tons of ice therefrom ; and that the defendants were citizens of Roxbury, and sold ice in other places than West Roxbury. The town afterwards presented a bill, at the rate of three cents a ton, which the defendants refused to pay, saying that they should try the title, and admitting that the wholesale market value of the ice was fifty cents a ton, and that the cost of cutting and carrying it away was from seventeen to twenty cents per ton.

The plaintiffs also offered the award in the case of *Common-wealth* v. *Roxbury*, (9 Gray, 454,) for the purpose of showing possession under the grant of 1636, as between the parties to that suit.

Upon this evidence, with other evidence which is now imma-terial, the judge directed a verdict for the defendants, in order to report the case for the determination of this court.

*T. P. Proctor & C. F. Blake*, for the plaintiffs. The act of 1636 granted to Roxbury the fee of the premises therein de-scribed. [The argument upon this point is omitted.] The col-ony ordinance of 1647 did not affect this title. *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1. Grant to Charlestown, 1 Col. Rec. 106. The utmost that can be claimed under that ordinance is, that it subjected the fee to an easement of free fishing and fowling. Ponds were not regal rights at common law, and have never been enumerated as such. *Com-monwealth* v. *Roxbury*, 9 Gray, 451. Bac. Ab. Prerogative, B. Com. Dig. Prerogative, D.

It is not necessary to prove that Roxbury took possession un-der the grant of 1636. The grant itself gave them a sufficient title, without entry. Stearns on Real Actions, 17. *M'Graw* v. *Bookman*, 3 Hill, (S. C.) 265. *Green* v. *Liter*, 8 Cranch, 229, 247. *Hoofnagle* v. *Anderson*, 7 Wheat. 212. *Stringer* v. *Young*, 3 Pet. 320, 342. *Lindsey* v. *Miller*, 6 Pet. 666. *Ward* v. *Fuller*, 15 Pick. 185. *Green* v. *Chelsea*, 24 Pick. 71. But the plaintiffs have shown actual possession by Roxbury. The vote of 1648 raises a presumption that the town then took possession. An entry on any part is an entry on all. 1 Washburn on Real Prop. 32. See also *First Parish in Shrewsbury* v. *Smith*, 14 Pick. 297. The plaintiffs have taken possession under the deed of Roxbury to them.

The acts of the defendants were a trespass, for which they are liable to the plaintiffs. Water covering land is the property of the owner of the land. *Gardner* v. *Newburgh*, 2 Johns. Ch. 162. *Goddard* v. *Dakin*, 10 Met. 94. *De Witt* v. *Harvey*, 4 Gray, 486. The fact that it is frozen can hardly divest the owner of his title. There is no authority for the proposition

that cutting ice is of common right. The right to cut it from another's land is an easement, which can only be acquired by grant or prescription. It cannot be established by custom. *Blewett* v. *Tregonning*, 3 Ad. & El. 554.

*W. Gaston & W. Colburn*, for the defendants, in addition to the argument upon the construction of the grant of 1636, contended that large natural ponds or lakes are owned by the public, and free to all persons for fishing, boating, taking water, and if water, then ice. Anc. Chart. 158. *Commonwealth* v. *Alger*, 7 Cush. 67. *Canal Commissioners* v. *The People*, 5 Wend. 447. *The State* v. *Gilmanton*, 9 N. H. 461. 3 Kent Com. (6th ed.) 429, *n.* If the fee is in West Roxbury, they hold it in trust for the public. Water is common property. 2 Bl. Com. 14, 18. If a man might lawfully sail over it from his land adjoining and take water, he might drive over it in winter and take ice. The town had no such possession as to enable them to maintain trespass. 1 Chit. Pl. (6th Amer. ed.) 175, 176. If the taking of ice was unlawful, the injury was to the public, and the remedy is by indictment. 3 Bl. Com. 219.

HOAR, J. The principal positions upon which the plaintiffs rely to maintain this action are these :

That by the act of May 3, 1636, the territory which includes Jamaica Pond was granted to the town of Roxbury ;

That by this grant, and the authority conferred on towns by the act of March 3, 1635, (1 Col. Rec. 172,) as interpreted by the act of March 18, 1684, (5 Col. Rec. 470,) the fee of the land on which the pond lies, including the water of the pond, vested in that town ;

That possession and ownership of the pond have been held and exercised by the town of Roxbury under the grant ;

That the title of Roxbury, when West Roxbury was set off from it as a new town, passed to the plaintiffs by virtue of the act of separation, and of the deed dated December 24, 1851 ;

So that the plaintiffs have a sufficient title to support an action of tort in the nature of trespass *quare clausum fregit* against any person who has entered upon the pond and cut and carried away ice without their permission, and in violation of an express prohibition.

We shall only have occasion to consider whether the conclusion necessarily follows from the premises; and therefore may assume, without deciding, that the fee of the land is in the plaintiffs. The important questions remain: 1. What are the nature and extent of the rights in great ponds secured to the public by the colony ordinances of 1641–1647? and 2. Did those ordinances affect the title of Roxbury under a grant previously made?

The first provision relating to great ponds is found in the Body of Liberties, § 16, supposed to have been adopted in 1641 — 8 Mass. Hist. Soc. Coll., 3d Series, 219: " Every inhabitant that is an howse holder shall have free fishing and fowling in any great ponds and bayes, coves and rivers, so farre as the sea ebbes and flowes within the presincts of the towne where they dwell, unlesse the free men of the same towne or the Generall Court have otherwise appropriated them, provided that this shall not be extended to give leave to any man to come upon others proprietie without there leave."

The great purpose of this article, as was said in *Commonwealth* v. *Alger*, 7 Cush. 68, was to declare a great principle of public right, to abolish the forest laws, the game laws, and the laws designed to secure several and exclusive fisheries, and to make them all free. But as originally adopted, it is to be noticed that the privilege of free fishing and fowling was confined to householders within the limits of the town where they reside, and that the right to go upon any man's "proprietie" without his permission is expressly excluded. The exception of those ponds, bays, coves and rivers which the freemen of the town or the general court had otherwise appropriated is also noticeable, as leading to the inference that such appropriations had in some cases been made. The only instance which the colony records furnish is the grant to John Humfry of "500 acres of land & a freshe pond, with a little ileland conteyneing aboute two acres," on the 6th of May 1635. 1 Col. Rec. 147. The land was not to be taken within five miles of any town; and it was agreed that the inhabitants of Salem and Saugus might build storehouses on the island, and lay in provisions there for use in time of need.

The "Body of Liberties" was the result of an attempt to satisfy the people at large, who desired something like a code of written laws as a protection and check upon the unlimited discretion of the magistrates; and at the same time to defer to the desire, on the part of some of the wiser and more prudent leaders of the colony, that many of the most essential regulations which its condition required should obtain the force of law by usage and custom, making them a part of the common law, rather than by express legislation, in order to avoid any direct antagonism with the government in England. 1 Winthrop's Hist. of New England, 322, 323. It was adopted with a declared reference to further examination, revision and amendment, and was not printed with the colony laws. The amendments which concerned the 16th section, as they appear in the edition of the colony laws of 1660, and in the Ancient Charters, 148, were quite material; and were probably adopted in 1647.[*] Great ponds are defined to be those containing more than ten acres of land, and it is provided that no town shall appropriate any great pond to any particular person or persons; and § 4 is as follows: "And for great ponds lying in common, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass and repass on foot through any man's propriety for that end, so they trespass not upon any man's corn or meadow."

We think it clear that by this ordinance it was intended to devote the great ponds to public use. *Cummings* v. *Barrett,* 10 Cush. 188. We are not aware that this law has ever been altered. They were not thenceforth to be appropriated to the use of any particular person or persons, but were declared to be "lying in common." The right of all persons to resort to them for fishing and fowling, the only use which at that time would seem to have been considered of appreciable value, was explicitly secured. With this was granted the right of passage even over private lands, excepting only such as were devoted to annual crops. The lying in common would be of itself a

---

[*] See 3 Allen, 513, *note;* 7 Cush. 67.

sufficient security for the right of passage in boats or upon the ice in winter, for the owners of adjoining lands, and for other persons, where the situation and size of the pond might make it serviceable as a way. It would scarcely be necessary to mention bathing, or the use of the water for washing, or watering cattle, preparation of flax, or other agricultural uses, to all which uses a large body of water, devoted to public enjoyment, would usually be applied. We suppose that many and perhaps most of the large ponds have some common land, or a public way of some kind, lying upon or leading to the shore, by which the public have access to them. In some parts of the country the larger lakes, with their connections, constitute almost the only avenues of transportation and travel, and are as much highways as the navigable rivers.

The uses which may be made of the water of ponds and lakes in Massachusetts, by littoral proprietors, have never been judicially determined; but by long and well established usage they are undoubtedly numerous. *Cummings* v. *Barrett*, 10 Cush. 188. With the growth of the community, and its progress in the arts, these public reservations, at first set apart with reference to certain special uses only, become capable of many others which are within the design and intent of the original appropriation. The devotion to public use is sufficiently broad to include them all, as they arise.

The rules of law which apply to questions of boundary on rivers have never been considered applicable to the great lakes or fresh water ponds. The boundary on a natural pond extends only to low-water mark. *Waterman* v. *Johnson*, 13 Pick. 261. *The State* v. *Gilmanton*, 9 N. H. 461. And it was said by Chancellor Walworth, in the case of *Canal Commissioners* v. *The People*, 5 Wend. 546, 547, in speaking of the different construction which the common law gives to the boundaries in grants upon tide-water and upon streams which are not navigable, that " the principle itself does not appear to be sufficiently broad to embrace our large fresh water lakes, or inland seas, which are wholly unprovided for by the common law of England. As to these there is neither flow of the tide nor thread

of the stream, and our own local law appears to have assigned the shores, down to the ordinary low-water mark, to the riparian owners ; and the beds of the lakes, with the islands therein, to the public." 'But in a recent case in the supreme court of New York it was held that a lake measuring less than a mile in width, by five miles in length, and having no navigable outlet, would pass under a grant of a large tract of land which included it in its boundaries. *Ledyard* v. *Ten Eyck*, 36 Barb. 102. That state, however, has no statute similar in its provisions to the Massachusetts ordinance above cited.

It would seem to afford some confirmation of the opinion that the ordinance of 1647 was designed to establish a large and important public right, that the provision concerning ponds is included in the same chapter of the colony laws which secures the right of free speech in courts and town meetings, and the freedom of emigration, and which regulates the respective rights of littoral proprietors and of the public upon the sea shore. Anc. Chart. 148, 149. And the usage and practice under the ordinance seems to have been consistent with the understanding that the ponds were public property. There is no adjudged case in which any right in them, adverse to the public, has ever been recognized ; and in the cases in which the water has been taken for the supply of towns and cities under legislative authority, we are not aware that any private ownership or title to the water in any town or city has been asserted and maintained as a ground of claim for damages. Such a claim might have been made, if it had been thought tenable, in respect to this very pond, when it was used to supply an aqueduct for the city of Boston, under *St.* 1794, *c.* 55; the rights of the town of Roxbury being specially excepted from the operation of the act.

But it is argued for the plaintiffs that, as the territory granted to Roxbury in 1636 included the pond within its boundaries, the ordinance of 1647 could have no application to it ; either because the Commonwealth had no power to dispose of property once granted to a town, or because the ordinance is not to be construed as operating upon ponds which did not belong to the

colony at the time it was enacted. To estimate justly the force of this objection, it is necessary to consider what was then the relation existing between the colonial government and the municipal corporations or quasi corporations which it created. In some cases the grant of land by the general court was to a company of proprietors, who preserved an organization separate from that of the town, and divided the lands proportionately among the settlers who participated in the grant, or sold them to others for the common profit. But in many instances, and, as we suppose, in all where there was not a separate body of proprietors to whom the territory was granted, the town by its establishment became the owner of the land within its assigned limits. Its functions were then of a twofold nature : to distribute the lands among the freemen for the purposes of settlement, reserving such parts as might be deemed requisite for various public uses; and to do its part as a constituent member of the new state, bearing its proportion of the public burdens; clothed with limited powers of self-government in local matters; but amenable to the Commonwealth, and subject to its control and direction. There can be no doubt that from the earliest period the legislature of the colony exercised the unquestioned authority of deciding what public duties should be discharged by the towns, including not only appropriations of money, but of lands. The duty to furnish and build highways, to provide burial-grounds, to maintain public worship and schools, with suitable meeting-houses and school-houses, the common custom of setting apart commons and training-fields, afford familiar examples of subjects clearly within the scope of legislative authority. The right to change the boundaries of towns, and to create new ones from the territory of towns already existing, was never questioned. By the provincial statute of 10 Geo. II., Anc. Chart. 505, the obligation to furnish and build at their own expense convenient ways was imposed upon the proprietors of all new plantations. On the 6th of March 1633 the general court ordered " that all the swamps containing above one hundred acres, either belonging to any town or not, shall lie in common for any free inhabitant to fetch wood at seasonable

times, without prejudice to the inhabitants where the same is, (that swamp only excepted lying within the New Towne pale towards the bay)." 1 Col. Rec. 111. After the passage of the ordinance of 1647, by which flats were annexed to the upland, it was even doubted whether the ordinance did not make void a previous appropriation of portions of the flats by the towns to which they belonged; and on an application by a town to the general court, which set forth that "the aforesaid inhabitants, not being able to resolve themselves, humbly desire the resolution of this honored court, whether the order of the court make void the preceding town order," it was resolved that "The court doth conceive the court's order doth not disannul the order of the town, preceding it." 2 Col. Rec. 284. 3 Col. Rec. 181.

The towns were public bodies, organized for public purposes; and any property granted to them, which had not been conveyed to private persons, they might rightfully, by the law and usage of the colony, be required to devote to such public uses as the legislative authority should, by general laws, designate and determine. Against the right of the public, it is manifest that no adverse title could be acquired or maintained by the town of Roxbury, by reason of any of the acts indicative of ownership which are stated in the report. They were not continuous, occurred at considerable intervals of time, and were not in their nature such exclusive acts of possession as would have any tendency to show a termination or relinquishment of the public use.

It will not follow, from the conclusion to which we come that the plaintiffs cannot maintain this action, that the defendants can lawfully cut and carry away ice from the pond to any extent and in any manner that they may choose. The right of any individual to use for his own pleasure or profit such a place of public resort must be limited by the rule that the similar right of others is not to be impaired or infringed. But if the defendants encroach upon the rights of others, the remedy is by indictment. And if, in thickly settled neighborhoods, the dif ferent uses which different persons may wish to make of the ponds are so various as to become conflicting, the towns have

power, by appropriate by-laws, to regulate the use and provide for the public convenience and safety. The cutting of ice is but one of the uses to which the water of the pond may be lawfully applied; and those who resort to it for bathing, boating, skating, fishing or fowling are entitled to equal consideration. If municipal regulations in any particular case prove insufficient, the legislature, as the guardian of the public inter ests, has ample power to furnish a remedy.

The result of all the considerations of the court upon the questions submitted may be recapitulated in these propositions:

1. Great ponds, containing more than ten acres, which were not before the year 1647 appropriated to private persons, were by the colony ordinance made public, to lie in common for public use.

2. This ordinance applied to all these ponds, whether at that time included within the territory granted to a town, or to any body of proprietors for the plantation of a town, or not then granted by the government of the colony, if they had not then been appropriated to particular persons, either by the freemen of the town or by the general court.

3. No possession adverse to the public right could be acquired or held by the town of Roxbury by means of any of the acts and votes set forth in the report.

4. Fishing, fowling, boating, bathing, skating or riding upon the ice, taking water for domestic or agricultural purposes or for use in the arts, and the cutting and taking of ice, are lawful and free upon these ponds, to all persons who own lands adjoining them, or can obtain access to them without trespass, so far as they do not interfere with the reasonable use of the ponds by others, or with the public right, unless in cases where the legislature have otherwise directed.

5. The town of West Roxbury had no such property in the ice on Jamaica Pond as would enable them to maintain this action, even if the fee of the pond be considered to be in the town.

6. The remedy for any unreasonable or excessive use of the

liberty of cutting ice, being the violation of a public right, is by indictment; and the towns may regulate the use of the ponds by reasonable by-laws, adopted and approved according to the statute ; and if these are insufficient, resort must be had to the legislature. *Judgment for the defendants.*